DIS/MTP: USAO 2014R00701

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.** TDC 18cr 12 |
| | * | |
| **MARK T. LAMBERT,** | * | **(Conspiracy to Violate the Foreign** |
| | * | **Corrupt Practices Act and to Commit** |
| **Defendant** | * | **Wire Fraud, 18 U.S.C. § 371; Violation** |
| | * | **of Foreign Corrupt Practices Act,** |
| | * | **15 U.S.C. § 78dd-2; Wire Fraud,** |
| | * | **18 U.S.C. § 1343; Money Laundering,** |
| | * | **18 U.S.C. § 1956(a)(2)(A); Aiding and** |
| | * | **Abetting, 18 U.S.C. § 2; Forfeiture,** |
| | * | **18 U.S.C. §§ 981(a)(1)(C) and** |
| | * | **982(a)(1), 28 U.S.C. § 2461(c))** |
| | * | |

**\*\*\*\*\*\*\***

## INDICTMENT

### COUNT ONE
**(Conspiracy to Violate the Foreign Corrupt**
**Practices Act and to Commit Wire Fraud)**

The Grand Jury for the District of Maryland charges that:

### Introduction

At times material to this Indictment:

*Relevant Entities and Individuals*

1.      Transportation Corporation A, a company whose identity is known to the Grand

Jury, was a United States company headquartered in Maryland, and thus a "domestic concern,"

as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code,

Section 78dd-2(h)(1)(B).   Transportation Corporation A was in the business of providing

logistical support services for the transportation of nuclear materials to customers in the United

States and to foreign customers, including to and from the Russian Federation.

2.      Defendant Mark T. Lambert ("defendant **LAMBERT**") was a citizen of the United States and resident of Maryland.   Defendant **LAMBERT** was an owner and executive of Transportation Corporation A from in or about August 1998 through in or about September 2016.   Defendant **LAMBERT** was also the co-President of Transportation Corporation A from in or about January 2010 through in or about September 2016.   Thus, defendant **LAMBERT** was a "domestic concern" and an officer, employee, and agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

3.      Daren Condrey ("Condrey"), who has been charged separately, was a citizen of the United States and resident of Maryland.   Condrey was an owner and executive of Transportation Corporation A from in or about August 1998 through in or about October 2014. Condrey and defendant **LAMBERT** were also the co-Presidents of Transportation Corporation A from in or about January 2010 through in or about October 2014.   Thus, Condrey was a "domestic concern" and an officer, employee and agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

4.      "Co-Conspirator One," a person whose identity is known to the Grand Jury, was an owner and executive of Transportation Corporation A with defendant **LAMBERT** and Condrey from in or about 1998 to in or about December 2009, and a consultant to Transportation Corporation A from in or about January 2010 through in or about 2011.

5.      JSC Techsnabexport ("TENEX") supplied uranium and uranium enrichment services to nuclear power companies throughout the world on behalf of the government of the Russian Federation.   TENEX was indirectly owned and controlled by, and performed functions of, the government of the Russian Federation, and thus was an "agency" and "instrumentality" of

a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

6.      TENAM Corporation ("TENAM"), located in the United States, was a wholly-owned subsidiary of TENEX established in or about October 2010.   TENAM was TENEX's official representative office in the United States.   TENAM was owned and controlled by, and performed functions of, the government of the Russian Federation, and thus was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

7.      Vadim Mikerin ("Mikerin"), a national of the Russian Federation, was a Director of TENEX from at least in or around 2004 through in or around 2011, and also was the President of TENAM from in or around October 2010 through in or around October 2014.   From in or around 2011 through in or around October 2014, Mikerin was a resident of Maryland.   Mikerin was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

8.      "Shell Company A," a company whose identity is known to the Grand Jury, was a shell company with a purported physical address in the Republic of Seychelles.   Shell Company A had bank accounts at financial institutions in Cyprus associated with a Russian national.

9.      "Shell Company B," a company whose identity is known to the Grand Jury, was a shell company with a purported physical address in the United Kingdom.   Shell Company B had a bank account at a financial institution in Latvia associated with a Russian national.

10. "Shell Company C," a company whose identity is known to the Grand Jury, was a shell company with a purported physical address in the British Virgin Islands. Shell Company C had bank accounts at financial institutions in Switzerland associated with a Russian national.

### The Foreign Corrupt Practices Act

11. The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign government official for the purpose of obtaining or retaining business for, or directing business to, any person.

### The Scheme to Defraud and Make Corrupt Payments

12. At some point in or before 2009, defendant **LAMBERT** and Condrey learned that Co-Conspirator One had agreed with Mikerin to make corrupt bribe and kickback payments in order for Transportation Corporation A to obtain and retain business and contracts with TENEX. Co-Conspirator One explained that the amount of each corrupt payment was based on an agreement with Mikerin to kickback a percentage of certain contract awards that TENEX awarded to Transportation Corporation A to benefit Mikerin, and that Mikerin would help Transportation Corporation A win contract awards with TENEX if such corrupt payments were made. Soon after learning of the corrupt and fraudulent scheme, defendant **LAMBERT** and Condrey agreed to enter into the conspiracy with Co-Conspirator One to make corrupt and fraudulent bribe and kickback payments to offshore bank accounts to benefit Mikerin in order to help Transportation Corporation A obtain and retain business with TENEX.

13.     In order to conceal and further the scheme, the co-conspirators, including defendant **LAMBERT** and Condrey, used the terms "remuneration" and "commission" when documenting the corrupt and fraudulent payments on an internal spreadsheet and when communicating with unknowing Transportation Corporation A employees who unwittingly processed the corrupt and fraudulent payments to offshore accounts.

14.     In order to justify Transportation Corporation A's corrupt and fraudulent payments to offshore accounts to benefit Mikerin, and to generate the money to make the payments, defendant **LAMBERT**, Condrey and others, including Co-Conspirator One and Mikerin, caused fake invoices to be prepared, which purported to be from TENEX to Transportation Corporation A and which fraudulently described services that were never provided by TENEX to Transportation Corporation A.   Defendant **LAMBERT**, Condrey, and others, including Co-Conspirator One, caused Transportation Corporation A to make the corrupt and fraudulent payments after Transportation Corporation A received the fraudulent invoices.

15.     Co-Conspirator One left Transportation Corporation A in early 2010, but continued to work as a consultant to Transportation Corporation A.   Upon Co-Conspirator One's departure from Transportation Corporation A, defendant **LAMBERT** and Condrey became co-Presidents of Transportation Corporation A and continued to conspire with Co-Conspirator One to communicate with Mikerin and facilitate the corrupt and fraudulent bribe and kickback payments.

16.     Co-Conspirator One died in or around August 2011.   After Co-Conspirator One's death and continuing through in or around October 2014, defendant **LAMBERT** and Condrey continued the corrupt and fraudulent bribe and kickback scheme and communicated

directly with Mikerin to obtain fraudulent invoices and facilitate the corrupt and fraudulent payments.

## The Conspiracy

17.     From in or around 2004 and continuing through in or around October 2014, in the District of Maryland and elsewhere, the defendant,

### MARK T. LAMBERT,

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Condrey, Co-Conspirator One and others, known and unknown, to commit offenses against the United States, namely:

a.     to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist defendant **LAMBERT**, Condrey, Co-Conspirator One, Transportation Corporation A, and others in obtaining and retaining business

for and with, and directing business to, Transportation Corporation A and others, in violation of Title 15, United States Code, Section 78dd-2; and

b.      to knowingly and with the intent to defraud, devise, and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice in violation of Title 18, United States Code, Section 1343.

### Manner and Means of the Conspiracy

18.      The manner and means by which defendant **LAMBERT** and others, including Condrey and Co-Conspirator One, sought to accomplish the objects of the conspiracy included, among other things, the following:

19.      It was part of the conspiracy that defendant **LAMBERT** and others, including Condrey and Co-Conspirator One, offered to pay, promised to pay, and authorized corrupt and fraudulent bribe and kickback payments for the benefit of Mikerin, in exchange for Mikerin's agreement to help Transportation Corporation A secure business and contracts with TENEX.

20.      It was further part of the conspiracy that defendant **LAMBERT** and others, including Condrey and Co-Conspirator One, discussed in person, and through, among other means, electronic mail ("email") and text messaging, making corrupt and fraudulent bribe and kickback payments to offshore accounts to benefit Mikerin in order for Transportation Corporation A to obtain and retain business with TENEX.

21.     It was further part of the conspiracy that defendant **LAMBERT** and others, including Condrey and Co-Conspirator One, concealed their scheme by using code words like "lucky figure," "LF," "lucky numbers," "cake," "remuneration," and "commission" when communicating about the corrupt and fraudulent bribe and kickback scheme.

22.     It was further part of the conspiracy that defendant **LAMBERT** and others, including Condrey and Co-Conspirator One, emailed with Mikerin at Mikerin's personal email address to discuss the corrupt and fraudulent bribery and kickback scheme, in order to evade detection by other TENEX officials and others who were not benefiting from the scheme.

23.     It was further part of the conspiracy that defendant **LAMBERT** and others, including Condrey and Co-Conspirator One, caused fraudulent invoices to be created and transmitted by email to others in order to document purported services that were not actually provided to Transportation Corporation A and to justify the payment of corrupt and fraudulent bribes and kickbacks to offshore accounts.

24.     It was further part of the conspiracy that defendant **LAMBERT**, Condrey, and Co-Conspirator One kept track of the corrupt bribe and kickback payments that had been made and were pending, and they agreed with Mikerin that the amount of each corrupt and fraudulent payment was based on an agreed-upon percentage of certain TENEX contract payments to Transportation Corporation A.

25.     It was further part of the conspiracy that defendant **LAMBERT** and others, including Condrey and Co-Conspirator One, concealed their corrupt and fraudulent bribe and kickback payments in a manner that allowed those payments to go undetected by certain TENEX officials and caused TENEX to overpay for Transportation Corporation A's services.

26.     It was further part of the conspiracy that defendant **LAMBERT** and others, including Condrey and Co-Conspirator One, caused Transportation Corporation A to wire corrupt and fraudulent bribe and kickback payments from Transportation Corporation A's bank account in Maryland to offshore bank accounts associated with companies that had no legitimate business relationship with Transportation Corporation A, such as Shell Company A in the Republic of Cyprus, Shell Company B in Latvia, and Shell Company C in Switzerland, for the purpose of executing and concealing the corrupt and fraudulent payments.

### Overt Acts

In furtherance of the conspiracy, and to achieve the objects thereof, at least one of the conspirators committed, and caused to be committed, in the District of Maryland and elsewhere, at least one of the following overt acts, among others:

A.     On or about September 23, 2011, Mikerin emailed defendant **LAMBERT** and Condrey from Mikerin's personal email address to provide inside information from TENEX to assist Transportation Corporation A obtain a new contract award over "the other two competitors," in exchange for additional corrupt bribe and kickback payments.   In the email, Mikerin requested, in relevant part, that defendant **LAMBERT** and Condrey "initiate from your side new quotations for filled and empty cylinders transportation" for 2012 and 2013 and specified that the "rates should include new Lucky Figures."

B.     On or about September 23, 2011, defendant **LAMBERT** replied to Mikerin's email referenced in Paragraph A above, and defendant **LAMBERT** submitted a draft email for Mikerin to review, which defendant **LAMBERT** intended to send to the TENEX senior official and included the specific pricing terms suggested by Mikerin.

9

C.     On or about September 23, 2011, after Mikerin approved the draft language proposed by defendant **LAMBERT** in the email referenced in Paragraph B above, defendant **LAMBERT** emailed the exact language and pricing terms that Mikerin approved to the senior official at TENEX, copying Condrey.

D.     On or about September 27, 2011, defendant **LAMBERT** spoke by phone with a representative from Transportation Corporation A's bank to authorize the wire transfer of approximately $81,397.21 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia, and defendant **LAMBERT** confirmed on the call that the payment was in reference to "Invoice No. 35558, dated September 22, 2011."

E.     On or about September 27, 2011, Transportation Corporation A made a wire transfer payment of approximately $81,397.21 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia.

F.     On or about October 19, 2011, Condrey emailed defendant **LAMBERT** projected pricing estimates for Transportation Corporation A to offer TENEX for 2011, 2012, and 2013, and Condrey explained that "10% as TENEX Remuneration for each package" was built into the prospective quotes to TENEX.

G.     On or about October 20, 2011, defendant **LAMBERT** emailed Condrey with new pricing estimates for Transportation Corporation A to offer TENEX for 2011 – 2014, which also included "TENEX Remuneration" built into the prospective quotes to TENEX.

H.     On or about December 2, 2011, Mikerin emailed defendant **LAMBERT** and Condrey from his personal email address, with the subject line, "news and lucky figure," and

10

stated, in relevant part, ". . . with the understanding of the forthcoming end of Q4 and CY2011 please tell me what lucky figure will be when we should start our process (docs, etc.)."

I.        On or about December 20, 2011, as a follow-up to the "news and lucky figure" email referenced in Paragraph H above, Condrey replied to Mikerin at his personal email address, copying defendant **LAMBERT**, "I am off from work today. . . . Just shoot me an email with your proposal, or you can call Mark [**LAMBERT**] at the office as he is fully informed, and we can finalize how you want to proceed."

J.        On or about December 21, 2011, Mikerin sent an email to defendant **LAMBERT** and Condrey, in which Mikerin referenced the "'Lucky figures' being calculated for Q4 2011 . . . [and] based on this the Invoice will be arranged just today and sent to you.   [Y]our payment is to be effected on [December] 23 in order to be ahead of the holiday season and to allow [Shell Company B] to get the funds early next week.   [I]f our Big Friend improves the issue some time later and you are Ok with the results we will reestablish Lucky Figures for Q1 2012[.]   I've just got 'Ok' to proceed with [Shell Company B] in the shortest possible time (hot market activities) and kindly request you to confirm and give 'green light'."

K.        On or about December 21, 2011, Condrey sent an email to Mikerin at his personal email address in response to the email referenced in Paragraph J above, copying defendant **LAMBERT**, to "confirm and give the 'Green Light,'" and to request the invoice.

L.        Later that day, on or about December 21, 2011, Mikerin emailed Condrey from his personal email address.   Mikerin attached a document to the email, which purported to be TENEX "Invoice No. 35685" and was dated December 12, 2011.   The document fraudulently

described services that were never provided to Transportation Corporation A to justify a corrupt and fraudulent payment of approximately $125,930.53.

M.      On or about December 22, 2011, defendant **LAMBERT** spoke by phone with a representative from Transportation Corporation A's bank to authorize the wire transfer of approximately $125,930.53 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia, and defendant **LAMBERT** confirmed on the call that the payment was in reference to "Invoice No. 35685, dated December 12, 2011."

N.      On or about December 22, 2011, Transportation Corporation A made a wire transfer payment of approximately $125,930.53 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia.

O.      On or about March 27, 2012, Mikerin emailed defendant **LAMBERT** and Condrey from his personal email account, and stated in relevant part, "Hello Daren [Condrey] and Mark [**LAMBERT**], Thank you both for your visit [to] our 'noisy' location on Monday and energetic lunch together. . . . Also a channel for 'lucky figures' process has been checked and confirmed (no changes), so you will get an invoice for the amount [$]48,089.30 tomorrow. Would you please to confirm that it'll be done before the end of the month of Q1 or early next week[?]"

P.      On or about March 28, 2012, Mikerin emailed Condrey from his personal email account and attached a document, which purported to be TENEX "Invoice No. 1547-12."   The document fraudulently described services that were never provided to Transportation Corporation A to justify a corrupt and fraudulent payment of approximately $48,089.30.

Q.       On or about March 29, 2012, defendant **LAMBERT** spoke by phone with a representative from Transportation Corporation A's bank to authorize the wire transfer of approximately $48,089.30 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia, and defendant **LAMBERT** confirmed on the call that the payment was in reference to "Invoice No. 1547-12, dated March 28, 2012."

R.       On or about March 29, 2012, Transportation Corporation A made a wire transfer payment of approximately $48,089.30 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia.

S.       On or about May 25, 2012, Transportation Corporation A made a wire transfer payment of approximately $121,962.33 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia.

T.       On or about June 8, 2012, defendant **LAMBERT** sent an email to Condrey, stating in part, "I never thought [a senior official at TENEX] was our friend – which is strange given the situation with Vadim [Mikerin] and his lucky numbers."

U.       On or about August 30, 2012, Transportation Corporation A made a wire transfer payment of approximately $108,950.80 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia.

V.       On or about December 18, 2012, Transportation Corporation A made a wire transfer payment of approximately $142,204.30 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia.

W.      On or about March 28, 2013, Condrey caused Transportation Corporation A Invoice No. 13-104, dated March 27, 2013, to be sent by private mail courier to TENEX in Russia to request payment for services rendered for $192,737.50.

X.      On or about April 2, 2013, Mikerin emailed Condrey from his personal email address, with the subject line "Figures," and stated, "[p]lease advise when Q1 'LF' can be done to check on our side in advance."

Y.      On or about April 3, 2013, Condrey sent an email to Mikerin in response to the email referenced in Paragraph X above, and attached a draft of an internal spreadsheet that documented Transportation Corporation A's contracts with TENEX and the corrupt and fraudulent bribe and kickback payments that Transportation Corporation A owed TENEX under the column "7% Remun."   Condrey stated, "See attached.   If we receive payment of 13-104 [the invoice referenced in Paragraph W above] by April 26 (when due) then we may be able to arrange full amount by end of April."   Condrey explained that Transportation Corporation A could make a corrupt payment without the kickback associated with Invoice No. 13-104 at that time, or Transportation Corporation A could wait until TENEX paid amount invoiced in 13-104, at which point Transportation Corporation A would be in a position to make the full corrupt payment.

Z.      On or about April 28, 2013, after TENEX had remitted payment to Transportation Corporation A for Invoice No. 13-104, Mikerin emailed Condrey from his personal email address, stating, "Please find the due Invoice.   Please not[e] that the previous file was provided with the NEW INSTRUCTIONS where to go ([Shell Company C] instead of [Shell Company B]). . ."   Mikerin attached a document that purported to be TENEX "Invoice No. 1368-04,"

which was dated April 25, 2013 and fraudulently described services that were never provided to Transportation Corporation A to justify a corrupt and fraudulent payment of approximately $25,774.

AA.     On or about May 6, 2013, defendant **LAMBERT** authorized Transportation Corporation A's bank to wire transfer approximately $25,774 from Transportation Corporation A's bank account in Maryland to a Shell Company C bank account in Switzerland.

BB.     On or about May 6, 2013, Transportation Corporation A made a wire transfer payment of approximately $25,774 from Transportation Corporation A's bank account in Maryland to a Shell Company C bank account in Switzerland.

CC.     On or about July 11, 2013, defendant **LAMBERT** authorized Transportation Corporation A's bank to wire transfer approximately $95,833.55 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia.

DD.     On or about July 11, 2013, Transportation Corporation A made a wire transfer payment of approximately $95,833.55 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia.

EE.     On or about August 28, 2013, Mikerin emailed defendant **LAMBERT**, in relevant part, ". . . please advise me (based on our short business meeting with Daren [Condrey] last Tue.) how quick we can proceed with our "LF" matter, possible by the end of this week? As agreed with Daren [Condrey] I sent an e-mail (with a doc enclosed) on Mon. [August 26, 2013] but didn't hear from him."

FF.     On or about August 30, 2013, defendant **LAMBERT** authorized Transportation Corporation A's bank to wire transfer approximately $94,102 from Transportation Corporation A's bank account in Maryland to a Shell Company C bank account in Switzerland.

GG.     On or about August 30, 2013, Transportation Corporation A made a wire transfer payment of approximately $94,102 from Transportation Corporation A's bank account in Maryland to a Shell Company C bank account in Switzerland.

HH.     On or about October 17, 2013, defendant **LAMBERT** and Condrey sent the following messages to one another from defendant **LAMBERT's** personal email address to Condrey's phone:

> Condrey:     I meet with Vadim [Mikerin] tomorrow.   I told him we need to talk about LF.   We cannot stay competitive against others. . . .

> **LAMBERT**:   We need to figure out if [two senior officials at TENEX] know about LF.

> Condrey:     They are part of group. [Other Tenex officials] not so much. My guess.

> **LAMBERT**:   Yeah. Hard to tell. Sure [that one of the other TENEX officials] is not.

> Condrey:     Yep.

II.     On or about October 30, 2013, Transportation Corporation A made a wire transfer payment of approximately $77,896 from Transportation Corporation A's bank account in Maryland to a Shell Company C bank account in Switzerland.

JJ.     On or about March 28, 2014, Transportation Corporation A made a wire transfer payment of approximately $28,504 from Transportation Corporation A's bank account in Maryland to a Shell Company C bank account in Switzerland.

KK.　On or about October 1, 2014, Transportation Corporation A made a wire transfer payment of approximately $45,954.45 from Transportation Corporation A's bank account in Maryland to a Shell Company C bank account in Switzerland.

18 U.S.C. § 371

## COUNTS TWO THROUGH EIGHT
### (Foreign Corrupt Practices Act)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 16 and 18 through 26 and Overt Acts A through KK of Count One are incorporated here.

2.      On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

### MARK T. LAMBERT,

who was a domestic concern and an officer, employee, and agent of a domestic concern within the meaning of the FCPA, willfully made use of, and aided, abetted, and caused others to make use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official, and to any person, while knowing that the money and thing of value will be offered, given, and promised, directly and indirectly, to any foreign official for the purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist defendant **LAMBERT**, Condrey, Co-Conspirator One, and Transportation Corporation A, in obtaining and retaining business for and with, and directing business to defendant **LAMBERT**, Condrey, Co-Conspirator One, Transportation Corporation A, and others, as follows:

18

| Count | Approximate Date | Corrupt Means and Instrumentalities of Interstate Commerce |
|-------|------------------|-------------------------------------------------------------|
| 2 | September 27, 2011 | Wire transfer of approximately $81,397.21 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia for the benefit of Mikerin |
| 3 | December 22, 2011 | Wire transfer of approximately $125,930.53 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia for the benefit of Mikerin |
| 4 | March 29, 2012 | Wire transfer of approximately $48,089.30 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia for the benefit of Mikerin |
| 5 | May 6, 2013 | Wire transfer of approximately $25,774 from Transportation Corporation A's bank account in Maryland to a Shell Company C bank account in Switzerland for the benefit of Mikerin |
| 6 | July 11, 2013 | Wire transfer of approximately $95,833.55 from Transportation Corporation A's bank account in Maryland to a Shell Company B bank account in Latvia for the benefit of Mikerin |
| 7 | August 30, 2013 | Wire transfer of approximately $94,102 from Transportation Corporation A's bank account in Maryland to a Shell Company C bank account in Switzerland for the benefit of Mikerin |
| 8 | October 1, 2014 | Wire transfer of approximately $45,954.45 from Transportation Corporation A's bank account in Maryland to a Shell Company C bank account in Switzerland for the benefit of Mikerin |

15 U.S.C. § 78dd-2
18 U.S.C. § 2

## COUNTS NINE AND TEN
**(Wire Fraud)**

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs 1 through 10, 12 through 16, and 18 through 26 and Overt Acts A through KK of Count One are incorporated here.

### The Scheme to Defraud

2.     Between in or about 2011 and in or about 2014, the defendant,

**MARK T. LAMBERT,**

devised and intended to devise a scheme to defraud TENEX, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

### Execution of the Scheme to Defraud

3.     On or about each of the dates set forth below, in the District of Maryland and elsewhere, defendant **LAMBERT** and others, including Condrey and Mikerin, for the purpose of executing the scheme described above, and attempting to do so, did knowingly and with the intent to defraud, devise, and intend to devise a scheme and artifice to defraud TENEX, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, as follows:

| Count | Approximate Date | Transmission |
|-------|-----------------|--------------|
| 9 | December 21, 2011 | An email was sent from the Russian Federation to Condrey in Maryland, attaching a document purporting to be TENEX Invoice No. 35685 |
| 10 | April 15, 2013 | TENEX wire transferred payment of $192,737.50 from the Russian Federation to a Transportation Corporation A bank account in Maryland in satisfaction of Invoice No. 13-104 |

18 U.S.C. § 1343

## COUNT ELEVEN
### (Money Laundering)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 16 and 18 through 26 of Count One are incorporated here.

2.      On or about the dates set forth below, in the District of Maryland and elsewhere,

defendant,

### MARK T. LAMBERT,

did knowingly transfer and attempt to transfer funds, that is wire transfers of U.S. currency in the

following amounts, from a place in the United States, that is the District of Maryland, to a place

outside the United States, that is Switzerland, as set forth below, with the intent to promote the

carrying on of specified unlawful activity, that is, violations of the Foreign Corrupt Practices

Act, Title 15, United States Code, Section 78dd-2; and violations of the wire fraud statute, Title

18, United States Code, Section 1343; to wit, a wire transfer on May 6, 2013 of approximately

$25,774 from Transportation Corporation A's bank account in Maryland to a Shell Company C

bank account in Switzerland.

18 U.S.C. § 1956(a)(2)(A)
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and Title 28, United States Code, Section 2461(c), in the event of the defendant's convictions of the offenses in violation of 18 U.S.C. § 371, 15 U.S.C. § 78dd-2, 18 U.S.C. §§ 1343 and 1956(a)(2)(A), and 18 U.S.C. § 2, as set forth in Counts One through Ten of this Indictment.

### Foreign Corrupt Practices Act Forfeiture

2.      As a result of the offenses charged in Counts One through Eight of this Indictment, the defendant,

**MARK T. LAMBERT,**

shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to any such violation.

### Wire Fraud and Money Laundering Forfeiture

3.      As a result of the offenses charged in Counts One, Nine, and Ten of this Indictment, the defendant,

**MARK T. LAMBERT,**

shall forfeit to the United States (1) any and all property obtained directly or indirectly as a result of any such violation, (2) any and all property used, or intended to be used, in any manner or part to commit and to facilitate the commission of any such violation charged in this Indictment; and

any property, real or personal, which was involved in such an offense or was traceable to such an offense.

## **Substitute Assets**

4.     If any of the property described above in paragraphs 2 and 3 above as being subject to forfeiture, as a result of any act or omission of any defendant --

       a.     cannot be located upon the exercise of due diligence;

       b.     has been transferred or sold to, or deposited with, a third party;

       c.     has been placed beyond the jurisdiction of the court;

       d.     has been substantially diminished in value; or

       e.     has been commingled with other property that cannot be subdivided

           without difficulty;

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853, to seek forfeiture of any other property of said defendant.

18 U.S.C. §§ 981(a)(1)(C), 982(a)(1)
28 U.S.C. § 2461(c)

Sandra L. Moser
Acting Chief, Fraud Section
Criminal Division
Department of Justice

Stephen M. Schenning
Acting United States Attorney
District of Maryland

A TRUE BILL:

**SIGNATURE REDACTED**
Foreperson

Date:   January 10, 2017

24