IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. TDC-18-0012 |
| | * | |
| MARK T. LAMBERT, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | ****** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its undersigned counsel, submits this memorandum in aid of sentencing. Defendant Mark T. Lambert is scheduled to be sentenced on March 25, 2020, at 9:00 a.m. For the reasons set forth below, the government respectfully requests that the Court impose a Guidelines sentence of 151 months, to be followed by three years of supervised release.

### I. Introduction and Background

#### A. Procedural History

On November 22, 2019, a jury convicted Mark Lambert on one count of conspiracy to violate the Foreign Corrupt Practices Act (FCPA) and to commit wire fraud, in violation of 18 U.S.C. § 371; four counts of substantive FCPA violations, in violation of 15 U.S.C. § 78dd-2; and two counts of wire fraud, in violation of 18 U.S.C. § 1343. ECF 176. The defendant was acquitted of three substantive FCPA counts and one money laundering count. *Id*.

#### B. Summary of the Facts

According to the evidence, the defendant was the part-owner and co-President of Transport Logistics International, Inc. ("TLI"). The defendant and the defendant's company were involved in the highly sensitive business of transporting nuclear materials between the Russian Federation and the United States. Despite the defendant's involvement in an industry that implicates the security

and safety of the United States, between in or about 2007 and October 2014, the evidence at trial established beyond a reasonable doubt that the defendant chose to act corruptly and criminally to enrich himself and his co-conspirators by, among other things, conspiring with, and paying bribes to a Russian official, Vadim Mikerin ("Mikerin"), in order to corruptly obtain lucrative nuclear transportation contracts for the defendant's company, TLI.

The defendant was one of the original founders of TLI and was one of the owners and executives of the company from in or about August 1998 through in or about September 2016. The defendant became co-President of TLI from in or about January 2010 through in or about September 2016 after Rod Fisk, another co-founder of the company, retired.

Mikerin, a foreign official and a national of the Russian Federation, was a Director of TENEX from at least in or around 2004 through in or around 2011 and the President of TENEX's U.S. subsidiary TENAM Corporation ("TENAM") from in or around October 2010 through in or around October 2014. TENEX, with the support of TENAM, supplied uranium and uranium enrichment services to nuclear power companies throughout the world on behalf of the government of the Russian Federation.

The evidence at trial showed that in or around 2007, the defendant learned that Fisk had agreed to make corrupt bribe payments to Mikerin in order for TLI to obtain and retain contracts with TENEX. Fisk explained to the defendant that the amount of each corrupt payment was based on an agreement to kickback to Mikerin a percentage of the contracts that TENEX awarded to TLI, in exchange for Mikerin ensuring that TLI was awarded the contracts directly, without having to participate in a bidding process. Soon after learning of the corrupt and fraudulent scheme, the defendant agreed to make corrupt and fraudulent bribe payments to offshore bank accounts for the benefit of Mikerin. The defendant participated in the bribery scheme for nearly seven years. Fisk

left the company in December 2009 and died in August 2011, but the defendant continued to bribe Mikerin until October 2014, when the scheme was exposed.

In order to conceal and further the scheme, the defendant and his co-conspirators lied and used the terms "remuneration" and "commission" when documenting the corrupt and fraudulent payments on internal spreadsheets and when communicating with unwitting TLI employees who processed the corrupt and fraudulent payments to the offshore accounts.

The defendant and his co-conspirators also used code words like "lucky figure," "LF," and "cake" when discussing the corrupt TLI payments among themselves and with Mikerin; the defendant e-mailed directly with Mikerin at Mikerin's personal and pseudonymous e-mail account, marvijodel@gmail.com, when discussing the criminal scheme; and, the defendant, along with co-conspirator and co-President Daren Condrey, created and used deceptive spreadsheets and acquired fake invoices under the "TENEX" name to make it appear as if TENEX was actually getting paid for services. In fact there were no services provided; the invoices were prepared without the knowledge of TENEX and were used to "paper" the files and conceal detection of the criminal scheme from others at TLI and its parent company, Daher.

All told, the defendant and his co-conspirators authorized TLI's bank to make over $1.5 million in corrupt bribe payments to offshore bank accounts located in Cyprus, Latvia and Switzerland in the names of shell companies located in the Seychelles, the British Virgin Islands and the United Kingdom, for the benefit of a Russian official in order to corruptly and criminally enrich themselves.

## II. The Defendant's Guidelines Offense Level Calculation

### A. Overview

The government submits that the defendant's final adjusted offense level should be 34, and the defendant's Criminal History Category is I. The Guidelines range for a defendant with Criminal History Category I and an adjusted offense level of 34 is 151 to 188 months. The government recommends a sentence at the low end of this Guidelines range: 151 months' imprisonment, to be followed by three years of supervised release. The government submits that this recommended sentence, which is at the low end of the Guidelines range, is appropriate, given the seriousness of the conduct at issue, and is not greater than necessary to satisfy the purposes of the sentencing factors articulated in 18 U.S.C. § 3553(a).

### B. Offense Level Calculation

The applicable base offense level is 12, pursuant to United States Sentencing Guidelines ("U.S.S.G.") §§ 2X1.1(a) and 2C1.1(a)(2), because the defendant was not a public official. Pre-Sentence Report ("PSR") at 8-9. A two-level upward adjustment was properly applied because more than one bribe was involved. *See* PSR at 9, U.S.S.G. § 2C1.1(b)(1). Because the total benefit received was more than $9.5 million but less than $25 million, 20 levels were properly added, pursuant to U.S.S.G §§ 2C1.1(b)(2) and 2B1.1(b)(1)(K).

The offense also involved a public official in a high-level decision-making or sensitive position (TENEX Director/TENAM President Vadim Mikerin), and therefore the PSR includes an additional 4-level enhancement, pursuant to U.S.S.G § 2C1.1(b)(3). The PSR thus calculates the final adjusted offense level as 38, resulting in an advisory guideline range of 235 to 293 months' imprisonment. *Id.* at 13. However, the government acknowledges that it did not apply this enhancement to the executed plea agreement for cooperating co-conspirator Daren Condrey. In

order to avoid disparate sentencing calculations for the defendant and Condrey, the government's sentence recommendation herein is based upon a revised Guidelines calculation that omits this enhancement. Accordingly, the final adjusted offense level is 34.

### C. Benefit Calculation

U.S.S.G. § 2C1.1(b)(2) states, in relevant part, that "[i]f the value of the payment [or] the benefit received or to be received in return for the payment, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount."

Where, as here, the defendant helped pay a bribe to benefit a company on whose behalf he was acting, the commentary to the Sentencing Guidelines and several courts have made clear that the value of the "benefit received or to be received" refers to the benefit received by the company on whose behalf the individual paid the bribe, as well as any co-conspirator. *See* U.S.S.G. § 2B4.1 ("As with non-commercial bribery, this guideline considers not only the amount of the bribe but also the value of the action received in return. Thus, for example, . . . [i]f a gambler paid a player $5,000 to shave points in a nationally televised basketball game, the value of the action to the gambler would be the amount that he *and his confederates* won or stood to gain." (emphasis added)); *United States v. Cohen*, 171 F.3d 796, 803 (3d Cir. 1999) ("'[I]mproper benefit' refers to the net value accruing to the entity on whose behalf the individual paid the bribe."); *United States v. Kinter*, 235 F.3d 192, 197 (4th Cir. 2000) ("[W]e join all of the other circuit courts that have considered the issue, which have uniformly held that when a middleman defendant acts on behalf of a third-party payer of the bribe, the district court may consider the payer's bribe-generated benefits when calculating the 'benefit received' under U.S.S.G. § 2C1.1, as long as those profits were reasonably foreseeable or the result of acts aided, abetted, counseled, commanded, induced, procured, or willfully caused by

the defendant."); *United States v. Montani*, 204 F.3d 761, 770 (7th Cir. 2000) (noting that "the value should be considered as a *whole*, not as individual shares to each co-conspirator" (emphasis in original)).

"The value of 'the benefit received or to be received' means the net value of such benefit." U.S.S.G. § 2C1.1 cmt. n.3. The Guidelines commentary equates "net value" to profit. *See id*. ("Examples: … (B) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000."). However, regardless of the profit as reported by the company, the Court may *not* deduct the value of the bribes from the revenues earned. *Id*. ("Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received.").

To calculate the "net value" of the benefit, courts start with gross revenue from the ill-gotten benefit, and then subtract "direct costs"; courts do not deduct either the value of the bribe payment or any "indirect costs." *See*, *e.g.*, *United States v. Glick*, 142 F.3d 520, 525 (2d Cir. 1998) ("In calculating the amount of 'improper benefit,' only direct costs, not indirect costs, should be subtracted from the gross value received."). Direct costs are "all variable costs that can be specifically identified as costs of performing a contract. This might include, for example, transportation costs for the goods in question." *United States v. Landers*, 68 F.3d 882, 884 n.2 (5th Cir. 1995).

On the other hand, "[i]ndirect costs (fixed costs) are the costs incurred independently of output. For example, rent and debt obligations are costs a business incurs no matter how many contracts it receives. For the most part, overhead costs are fixed or indirect costs. The marginal increase in variable overhead costs from a wrongfully obtained contract is normally so *de minimis* that accounting for them during sentencing would be impractical." *Id.* at 885 n.3; *see also id*. at 884

n.2 ("Thus, variable overhead costs that cannot easily be identified to a specific contract are not direct costs."). "Like a bribe, indirect costs have no impact on the harm caused by the illegal conduct. This is true whether one considers the pecuniary benefit to the bribing party or the pecuniary loss to a competitor. For both parties, the benefit of an additional contract is measured by gross revenue minus direct costs. By definition, indirect costs do not affect that value." *Id.* at 885; *see United States v. Lianidis*, 599 F.3d 273, 281 (3d Cir. 2010) ("Put succinctly, whether a cost is direct or indirect depends on whether it can be easily attributed to the specific contract at issue."); *United States v. DeVegter*, 439 F.3d 1299, 1304 (11th Cir. 2006) ("Unlike the accounting term 'direct costs,' for sentencing purposes, variable overhead costs not easily identifiable to a specific contract are not direct costs. The court can ignore these variable costs in sentencing because the sentencing courts are not required to make precise calculations." (internal citations omitted)).

"The government bears the burden of establishing the estimated net value with reliable and specific evidence." *DeVegter*, 439 F.3d at 1304; *see also Lianidis*, 599 F.3d at 278 ("We have held that the government bears the burden of showing 'benefit received.'"). However, in several circuits it is the defendant who has "the burden of proving what direct costs should be subtracted in determining the net improper benefit." *DeVegter*, 439 F.3d at 1305; *see Glick*, 142 F.3d 520 at 525 (refusing to deduct costs from the value of the improper benefit received because the defendant "failed to establish direct costs sufficient to warrant a reduction of his sentence"); <u>Lianidis</u>, 599 F.3d at 281 ("[A]lthough it is the Government's burden to show 'net value,' the defendant bears the burden of producing the necessary documents. To hold otherwise would, in practice, prevent the government from meeting its burden of proof."); *but see United States v. Sapoznik*, 161 F.3d 1117 (7th Cir. 1998) ("The government does not deny that it was its burden, not the defendant's, to provide

evidence from which [the costs associated with the gambling that the bribes facilitated] could be estimated.").

In calculating the value of the benefit received, "[t]he district court need not determine the value of the benefit with precision." *United States v. Griffin*, 324 F.3d 330, 366 (5th Cir. 2003) (addressing § 2C1.1 in the context of an extortion case); *see also United States v. Collins*, No. 10-4898, 2011 U.S. App. LEXIS 8774, at *3 (4th Cir. Apr. 29, 2011) ("A district court need only make a reasonable estimate, given the available information before it."); *United States v. Gray*, 521 F.3d 514, 543 (6th Cir. 2008) (stating that the amount of benefit "need not be determined with precision").

Here, the total value of the benefit to TLI as a result of the corrupt scheme was $11,137,774.[1] Attached to this memorandum as Exhibit 1 is a Gain Analysis[2] for the revenues associated with corruptly obtained TLI contracts with TENEX from 2007 to 2014 – that is, contracts associated with "commission" or "remuneration" payments which, as was proven at trial, were simply code words for bribe payments. *See* Trial Tr. November 4, 2019 AM at 148:8-14 (Condrey explaining that he and his co-conspirators initially called the bribe payments to Mikerin "commissions" and later changed to calling them "remuneration"); *Id.* at 148:14-22 (Condrey stating that legitimate commissions were not paid to TENEX or any other customers); Trial Tr. November 4, 2019 PM at 52:8-25 (Condrey discussing Trial Ex. 111, a chart showing the contracts between TENEX and TLI

---

[1] The defendant has indicated that he does not contest the government's calculation of the value of the benefit received to TLI as a result of the corrupt scheme, although he is expected to argue that this figure should not be used as part of the sentencing calculation, and that instead the Court should look to a lesser amount, such as the amount of the bribes paid.

[2] The government has consulted with Michael Petron of Stout Risius Ross LLC regarding the gain analysis and related exhibits, and information provided herein is a result of that consultation. Given that the defense will not contest Mr. Petron's calculations, Mr. Petron is not expected to testify at sentencing, although he will be available as a witness should the Court so require.

- 8 -

that were procured by bribery); Trial Tr. November 5, 2019 AM at 64:19-65:2 (Condrey explaining that the TENEX contracts did not have remuneration clauses because remuneration was not paid to TENEX, only bribes);; Trial Tr. November 5, 2019 AM at 53:16-54:6 (Condrey discussing Trial Ex. 133, a CD containing the contracts between TENEX and TLI that were procured by bribery).

As outlined in Exhibit 1, between 2007 and 2014, TLI earned $32,902,773 in revenues from corrupt contracts with TENEX. This number does not reflect the "benefit received" from the corrupt contracts, however, because TLI also incurred $21,764,999 in direct costs as a result of executing the TENEX contracts. *Id.*; *see Glick*, 142 F.3d at 525 ("direct costs . . . should be subtracted from the gross value received"). Those costs expressly do not include the "remuneration" or bribe payments to the offshore companies for the benefit of Mikerin. U.S.S.G. § 2C1.1 cmt. n. 3. ("Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received."). Subtracting those direct costs from the sales revenue yields a profit of $11,137,774. *See* Exs. 1 and 2.

### III. Sentencing Factors

Consideration of the Guidelines and statutory factors in 18 U.S.C. § 3553(a)(2) and the history and characteristics of this defendant under 18 U.S.C. § 3553(a)(1), demonstrates that this is a serious crime warranting significant punishment and supervision. The defendant's conduct was egregious. The defendant acted criminally and corruptly in association with the shipment of nuclear materials between the Russian Federation and the United States, conspired with a Russian official to illegally line both of their pockets, and chose illicit self-enrichment over any regard for the safety of the community or integrity of the international marketplace.

### A. Seriousness of the Offense, Respect for the Law, and Just Punishment

The most significant consideration relevant to punishment in this case is the seriousness of the crime. The defendant's conduct in the conspiracy was not a one-off lapse in judgment: It was a sustained, multi-year effort to bribe his way into contracts worth tens of millions of dollars, and it involved a sophisticated and pervasive cover-up.

Moreover, the defendant's conduct occurred in a heavily regulated industry of utmost sensitivity and importance. Indeed, the contracts at issue were related to the transport of radioactive materials requiring the use of highly technical equipment and specially made containers designed to safeguard their contents. The radioactive materials in question were primarily a form of modified natural uranium called "feed," and an enriched form of uranium called LEU or "Low Enriched Uranium." In some cases, the LEU had been "downblended" from high enriched uranium formerly contained in Russian nuclear warheads. In other cases, the LEU was created through a process of enriching natural uranium. In either case, the feed and LEU being transported were valuable commodities that could be used to generate energy in nuclear power plants or that could themselves be further enriched to become weapons grade uranium used in nuclear arsenals. To state the obvious, the transportation of nuclear materials is particularly sensitive not simply because of the hazardous nature of those materials, but because of the terrifying potential consequences of those materials falling into the wrong hands.

The corruption of the nuclear industry is thus exceptionally serious; it undermines protections put in place to ensure that only qualified companies win the contracts to transport and safeguard the nuclear materials being moved around the world. *See* Mikerin Sentencing Tr., 8:14-cr-00529-TDC, DKT 119, 68:16-17 (this Court noting the elaborate nature of the scheme and that "the safety of

Americans and others could be at substantial risk," if the nuclear materials handled by TLI were not transported safely).

Whether TLI itself was a qualified company is irrelevant. The defendant and his co-conspirators helped corrupt and support a Russian official who had influence over the award of nuclear transportation contracts. And they helped devise the method and means by which he was able to divert funds into his own pocket to achieve his corrupt purposes. As this Court put it when describing this scheme at Mikerin's sentencing:

> an activity or a scheme in which the defendant and coconspirators would allow the process of selecting companies to carry out this highly sensitive activity to be corrupted by graft and bribery is very troubling, and does indicate that, relative to other crimes, this is perhaps more serious . . . .

Mikerin Sentencing Tr. at 69:3-9.

By engaging in the corrupt conduct, the defendant and his co-conspirators encouraged and reinforced a system that helped to undermine confidence in Russian and U.S. institutions and public safety, and that made it impossible for honest and ethical companies to compete for work. *See* Mikerin Sentencing Tr. at 72:11-17 (this Court noting that crimes involving foreign bribery raise significant concerns because they disadvantage legitimate businesses and are "an affront to American values of free and open economic competition and fundamental fairness in all of our processes").

**B. Adequate Deterrence and Protection of the Public**

A sentence in this matter plays an important role in deterring generally those who would consider engaging in similar conduct under similar circumstances. Given the strong economic incentives in taking advantage of countries with public officials willing to trade contracts for bribes, it is critical that there be equally strong counterincentives. *See United States v. Blech*, 550 F. App'x 70, 71 (2d Cir. 2014) (summary order) ("Blech was sentenced based on the 18 U.S.C. § 3553(a)

factors, including . . . the need for general deterrence for those who might otherwise feel that some white-collar crimes are 'game[s] worth playing.'" (quoting *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013)); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.")).

Indeed, the Court stressed this theme at Mikerin's sentencing, noting that the need to avoid disparity in sentences counseled against leniency for Mikerin because of the "significant divide between non-violent street type fraud cases involving lower level schemes . . . perpetrated by individuals of limited education and standing in society on the one hand, and corporate fraud perpetrated by high-level executives on the other," both of which "can lead to very high guideline range sentences." Mikerin Sentencing Tr. at 73:12-73:19. The Court went on to say that it and other Judges in the District of Maryland "have correctly given significant sentences even to first-time offenders in some of these lower level fraud cases, and I think to depart from that approach here because of the professional status, class, and resources of the defendant would create an unacceptable sentencing disparity among what I consider to be similarly-situated defendants." Mikerin Sentencing Tr. at 73:20-74:2.

Moreover, despite robust enforcement of the FCPA and other bribery laws over the last several years, criminal prosecutions of these complicated multinational schemes are still relatively rare as compared to other offenses. Threat of meaningful punishment is critical to creating real deterrence to corporate executives looking to do business with corrupt regimes. It is imperative to

send a message to the business community that corrupt conduct will not be tolerated, as it perverts business relationships, deprives companies of fair competition, financially benefits the few at the expense of the many, and leads to more and more sophisticated concealment practices that reward only the brazen.

### C. History and Characteristics of the Defendant

The government expects that a significant portion of the defendant's argument at sentencing will involve claims about the defendant's poor health. In particular, the defendant's counsel has represented in talks with the government that the defendant has advanced coronary heart disease that could, at any moment, necessitate the need for emergency treatment. They have also represented that, as a result of the fact that the defendant takes blood thinners, he is ineligible to serve his time in a "white collar camp."

The government disagrees as to the factual basis of those considerations, and will be prepared to address its position at sentencing, including the possibility of calling an expert at sentencing who has reviewed the defendant's medical records and who would testify as to the defendant's cardiac condition. The government also reserves the right to offer evidence from the Bureau of Prisons (BOP) that BOP can adequately manage the defendant's cardiac issues at BOP institutions, including at low level BOP institutions such as the facilities that the defendant refers to as "white collar camps."

### D. The Government's Recommended Sentence is Consistent with Others

The adjusted Guidelines range appropriately reflects the extent of the scheme and the overall benefit received through the lucrative contracts awarded to TLI over the period of the conspiracy. It also properly reflects the participation of the defendant, whose role—despite efforts to pin the scheme on others—was essential to the success of the scheme and to the financial benefits received individually by the participants and commercially by TLI.

The government submits that a sentence of 151 months' imprisonment is consistent with other sentences following trial convictions in foreign bribery and money laundering cases:

- In 2011, Joel Esquenazi was sentenced to 15 years in prison after being convicted at trial for paying approximately $890,000 in bribes to Haitian officials to secure telecommunication contracts. *United States v. Esquenazi, et al.*, 752 F.3d 912, 917-20 (11th Cir. 2014), *cert. denied*, 135 S.Ct. 293 (2014).

- In 2011, Carlos Rodriquez, Esquenazi's co-defendant, was sentenced to 7 years in prison after being convicted at trial for participating in the bribery scheme. *United States v. Esquenzi, et al.*, 752 F.3d 912, 917-20 (11th Cir. 2014), *cert. denied*, 135 S.Ct. 293 (2014).

- In 2012, Jean Rene Duperval was sentenced to 9 years in prison after being convicted at trial for laundering approximately $500,000 in bribes in connection with the Haitian bribery scheme to secure telecommunication contracts. *United States v. Duperval*, 777 F.3d 1324, 1328-31 (11th Cir. 2015), *cert. denied*, 136 S.Ct. 859 (2016).

- In 2016, Mahmoud Thiam was sentenced to 7 years in prison after being convicted at trial for laundering approximately $8 million in bribe proceeds in connection with a Guinean bribery scheme to secure mining contracts. *United States v. Thiam*, 934 F.3d 89, 92-93 (2d Cir. 2019); Judgment, *United States v. Mahmoud Thiam*, No. 17 Cr. 47 (S.D.N.Y.) ECF 136.

Indeed, the bribe amount in this case is significantly higher than the bribe amount in many of the cases cited above. Moreover, the defendant was not a mere participant in the scheme: he was the co-founder, part-owner, and co-President of the company that received contracts valued at over $30 million as a result of a bribe scheme that he personally helped devise, refine, and execute for nearly seven years.

Furthermore, although two other participants in this and related schemes received lower sentences, for the following reasons the government's recommended sentence here does not give rise to a disparate sentencing regime.

*1.     Vadim Mikerin's Sentence*

On August 31, 2015, Vadim Mikerin, Crim. No. TDC-14-0529, pled guilty to one count of conspiracy to commit money laundering, pursuant to 18 U.S.C. § 371. Thus, unlike the defendant,

he pled guilty and accepted responsibility for his crime. The government recommended a sentence 60 months, which fell at the top of Mikerin's Guidelines range. The explanation of Mikerin's lower Guidelines calculation is twofold. First, because Mikerin pled to 18 U.S.C. § 371, the top of his Guidelines range could not exceed the statutory maximum of 60 months. Second, even if Mikerin's sentence had not been capped, his Guidelines would have been lower than the defendant's because, as a public official, Mikerin was not capable of violating the FCPA, the specified unlawful activity grounding his money laundering offense.

Under § 2S1.1(a)(1), the Guidelines provision under which Mikerin was sentenced, the base offense level is the offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under U.S.S.G. § 1B1.3(a)(1)(A) (Relevant Conduct)); and (B) the offense level for that offense can be determined. If either of the two predicates for § 2S1.1(a)(1) do not apply, then the Guidelines add 8 levels to "the number of offense levels in § 2B1.1 . . . *corresponding to the value of the laundered funds*." (Emphasis added).

In Mikerin's case, the first predicate for § 2S1.1(a)(1) was not satisfied because, as a public official, Mikerin was statutorily exempted from violating the FCPA. *See, e.g.*, *United States v. Castle*, 925 F.2d 831, 832 (5th Cir. 1991) (noting that the FCPA "does not criminalize the receipt of a bribe by a foreign official"). As such, the base offense level for Mikerin was calculated using the value of the laundered funds (about $1.5 million) rather than the value of the benefit received (about $11.1 million). By contrast, the defendant here is not a public official and thus his conduct in violating the FCPA would be under-punished if, like Mikerin, he was treated as only responsible for the funds that were laundered, rather than for the full scope of his criminal activity which takes into account the significant benefit he and his company received as a result of his corrupt conduct.

Although the Court did vary from a Guidelines sentence in Mikerin's case, it did so for a limited reason that is straightforwardly not applicable here. And prior to imposing that variance, it laid out all the reasons why the other statutory factors did not weigh in favor of leniency, the reasoning for which applies equally here. Mikerin Sentencing Tr. at 67:14-74:4.

The one factor that did weigh in favor of a variance, in Mikerin's case, was the Court's finding that Mikerin was disadvantaged, and thus treated differently from other hypothetical defendants who were similarly culpable, by the fact that he was not a citizen or legal permanent resident of the United States. The reason is that Mikerin was detained after he was arrested and served part of his sentence pre-conviction. Pre-trial detention, the Court explained, was necessarily more "generic" than post-conviction detention would be insofar as it did not take into account the specifics of his crime. Thus, Mikerin underwent a more severe form of incarceration than he would have had he not been detained. Mikerin Sentencing Tr. at 74:25-75:16. The only basis for Mikerin's pre-trial detention, however, was the risk of flight due to his immigration status, and that "if he returned to Russia, he would not be able to be brought back for prosecution." Mikerin Sentencing Tr. at 75:4-6. The Court concluded that, in order to treat Mikerin fairly – that is, on an even footing with a hypothetical U.S. citizen who committed the same crime – it needed to vary from the Guidelines to account for the fact that, all told, Mikerin would have a harsher prison experience than a similarly situated U.S. citizen or permanent resident would. Mikerin Sentencing Tr. at 75:22-76:2.

Here, in stark contrast, the defendant is a U.S. citizen who did indeed have the benefit of awaiting and preparing for his trial free from detention and who will serve the entirety of his sentence post-conviction in a facility determined by the BOP to be suited to his crime. Thus, the sole reason articulated by the Court for varying from Mikerin's Guidelines sentence does not apply here.

## 2. *Boris Rubizhevsky's Sentence*

Boris Rubizhevsky pled guilty on June 15, 2015, Crim. No. TDC-15-0332, to one count of conspiracy to commit money laundering, pursuant to 18 U.S.C. § 1956(h). Rubizhevsky was not alleged to be involved in bribery whatsoever, nor was he involved in any conduct associated with the scheme at TLI. Rubizhevsky was involved in a separate Mikerin-related wire fraud scheme. Thus, Rubizhevsky's sentence is not relevant here, as it does not relate to any of the conduct for which the defendant was charged or for which he is being sentenced. In any event, because Rubizhevsky's Guidelines calculation was governed by § 2S1.1(a)(2) rather than § 2C.1.1, as with Mikerin, the enhancement under § 2B1.1 corresponded to "the value of the laundered funds," approximately $108,000, rather than to the value of the benefit received. Thus, Rubizhevsky's final adjusted offense level was only 15, with a range of 18-24 months imprisonment. Again, unlike the defendant, Rubizhevsky pled guilty and accepted responsibility for his crime, and this Court ultimately sentenced him to 12 months and one day.

Unlike either Mikerin or Rubizhevsky, the appropriate Guidelines calculation for the defendant must use the value of the benefit received to calculate the number of levels increased under § 2B1.1. *See* § 2C1.1(b)(2). Here, that calculation leads to an adjustment of 20 levels, because TLI received approximately $11.1 million in profits from the corrupt TENEX contracts, that is, "more than $9,500,000, but [] less than $25,000,000." *See* U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(b)(1)(K).

## 3. *Daren Condrey's Guidelines Calculation*

This above approach is entirely consistent with the Guidelines calculation of the person most similarly situated to the defendant, Daren Condrey. *See Crim. No. TDC-15-0336*. Indeed, in Condrey's plea agreement, the government used the very same analysis. At the time of Condrey's plea, the extent of the corrupt benefit to TLI was unknown. It was clear to the parties, however, that

TLI's profits would not exceed $100 million. As such, the parties agreed that the adjustment under § 2B1.1 would not be more than 24 levels. Because the bribe amount was more than $1.5 million, however, the parties also agreed that the adjustment under § 2B1.1 would not be less than 16 levels. Thus, the parties agreed to a floor of 16 and a ceiling of 24. Had the government had the opportunity to complete its benefits analysis prior to Condrey's plea, the adjustment under § 2B1.1 would have been precisely the same as the defendant's—namely, 20 levels, a number right in the middle of the projected range.

## IV. Conclusion

For the foregoing reasons, and after balancing the relevant factors and considerations to arrive at a recommended sentence, the government believes that the low end of the Guidelines range, 151 months of imprisonment followed by three years of supervised release, is appropriate to accomplish the goals of sentencing: punishment for a serious offense, general deterrence to other white collar criminals, avoiding unwarranted sentencing disparities, and promoting respect for the law.

DATE: March 11, 2020

Respectfully submitted,

| | |
|---|---|
| Robert A. Zink<br>Chief, Fraud Section<br>Criminal Division, Dept. of Justice | Robert K. Hur<br>United States Attorney |
| By: _____/s/_____<br>    Vanessa A. Sisti<br>    Assistant Chief<br>    Derek J. Ettinger<br>    Trial Attorney | By: _____/s/_____<br>    David I. Salem<br>    Assistant United States Attorney |